UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NEW ORLEANS FIRE FIGHTERS' PENSION & RELIEF FUND AND ITS WHOLLY OWNED SUBSIDIARY, FIRE EAGLE, LLC<br>     Plaintiff | )<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br><br>NO. 08-1564<br><br>SECTION N |
| Versus | )<br>) | MAG. 2 |
| RICHARD L. BISCHOFF; STEPHEN W. GURASICH, JR. ; ROBERT H. WEST; DONALD C. WALDEN; MORTON L. TOPFER; ALAN TOPFER; and RICHARD TOPFER<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) | |

**MEMORANDUM IN SUPPORT OF
FIRE EAGLE'S MOTION TO RECONSIDER
ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

NOW INTO COURT, through undersigned counsel, comes plaintiff, Fire Eagle, LLC, ("Fire Eagle"), which submits this Memorandum to Reconsider Order Granting Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. Fire Eagle submits that

1

the Court's Order granting the Motion to Dismiss for Lack of Personal Jurisdiction contains legal error and should be reconsidered.

**1.     The Legal Standard Utilized by the Court**

In the Court's Order and Reasons granting the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, the court relied on Sieferth v. Helicopteros Atuneros, Inc. 472 F.3d 266 (5th Cir. 2006), which utilized one of the several analyses employed by the Fifth Circuit to determine whether specific jurisdiction exists.

The Sieferth Court held that the plaintiff bears the burden of establishing jurisdiction but is required to present only *prima facie* evidence. Sieferth, 472 F.3d at 270 (citing Luv n' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006)). Further, the Sieferth court requires all relevant factual disputes to be resolved in the plaintiff's favor. Id.

Fire Eagle submits that *prima facie* evidence was, in fact, presented, and that the presentation was sufficient to defeat Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. Furthermore, Fire Eagle files this Motion for Reconsideration as the Court did not resolve all relevant factual disputes in the plaintiff's favor in granting the Motion to Dismiss. In particular, as shown below, Fire Eagle, in its 57 exhibits presented to the Court in its *Exhibits to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction* clearly showed the minimum contacts of the non-Bischoff Guarantors.

Fire Eagle's presentation was analyzed by the Court in two main categories, the one transaction claim, and the Bischoff presentation.

Fire Eagle will show that the facts previously presented to the Court show minimum contacts, which, under the Fifth Circuit mandate, must be accepted as true, must be resolved in Plaintiff's favor, and the Plaintiff's burden of presenting "only *prima facie* evidence" results in the clear determination that minimum contacts are, in fact, met. Sieferth, 472 F.3d at 270 (citing Luv n' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006)),

Clearly, the guarantors were seeking further funding from Louisiana in order to obtain a loan. The distinction drawn by the Court that the presentation sought was denied by the New Orleans Firemen should not result in the failure to find minimum contacts, but should be viewed and considered in the totality of circumstances, as required by the Fifth Circuit in Stuart v. Spademan 772 F.2d 1185, 1192 (5th Cir. 1985), as the eventual request by the guarantors through Bischoff was ultimately the result which occurred. The guarantors were at all times managing the debtor in possession in Texas, which forced the purchase by Fire Eagle of the first position debt under the intercreditor agreement. (See Exhibit A attached.)

Essentially, the Court splits the first and second loans as if they are separate transactions. Fire Eagle will show that documents presented to the Court consistently and repeatedly show that the loan would never have occurred, and that the lenders were recited to be third party beneficiaries of the rights of the Spillman Development Group under the Spillman Ranch Cooperation Agreement. That requirement was made by NOFF when the parties were preparing loans. Both the borrower (and the guarantors) agreed to this third party beneficiary relationship under the development agreement. (See

Exhibit 11 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction.)

Fire Eagle shows the specific exhibits which were included in the 57 exhibits to the Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction, as follows:

- Exhibit 27 – <u>Development Loan Agreement</u> (by and between SDG and ABT)

   at Article 1 Definition of Terms § 1.1 Budget (page 1) is defined as "the budget which is set forth on Exhibit "B" attached hereto and incorporated herein by reference as amended from time to time by Borrower with the prior consent of lender.

   Section 3.1 <u>Conditions to Initial Advance</u>

   (c) states "lender shall have received a fully executed original of the Intercreditor Agreement".  (Page 10.)

   Section 3.2 <u>Conditions to Advances</u>.  The obligation of lender to make each advance hereunder, including the Initial Advance, shall be subject to the prior or simultaneous occurrence or satisfaction of each of the following conditions:

   (w) which states, "except in connection with the Initial Advance, Borrower shall have furnished evidence satisfactory to Lender that the Junior Loan, in the amount of $4,100,000.00 has been fully funded and that the proceeds thereof have been utilized in connection with the Mortgaged Property in accordance with the Budget".  (Page 15.)

- Exhibit 28 – LOAN AGREEMENT BETWEEN FIRE EAGLE, LLC AND SPILLMAN DEVELOPMENT GROUP

  SUBORDINATION

  10.1 The Lender (Fire Eagle) agrees to execute any and all documents which may be requested by Borrower in order to: (i) subordinate all of the liens, encumbrances, security interests and other rights of the Lender securing the payment of the Loan to any and all liens, encumbrances, security interests and other rights which may be evidence and/or secure the payment of the Senior Indebtedness; and (ii) subordinate all of the rights which the Lender has to purchase the Project to any and all rights and/or options which may be granted to the PGA to purchase or acquire the Project and/or any interest therein.

  10.2 The Borrower agrees to arrange for the execution of any and all documents which may be requested by the Lender in order to subordinate all of the liens, encumbrances, security interest and other rights securing the payment of the Existing Land Loan, the Capital Debt and the Operating Debt to any and all liens, encumbrances, security interests and other rights which may evidence and/or secure the payment of the loan. (Page 28.)

- Exhibit 11 – Letter of Armbrust and Brown by Samuel D. Byars dated October 16, 2001 referencing $7,200,000.00 loan from American Bank of Texas to Spillman

Development Group. The letter is carbon copied to Mr. Bob West, Mr. Don Walden, Mr. Bob Brill (Mr. Biscoff's counsel), Mr. Bischoff, & Mr. Jack Norman, counsel for NOFF at the time.

The letter discusses requests for corrections in the partial assignment of the Development Agreement and the Special Warranty Deed. Additionally, Mr. Byars (counsel for SDG) states in reference to the ABT debt, "finally, we have attempted to incorporate your comments to the Spillman Ranch Cooperation Agreement and have recited <u>that both lenders are third party beneficiaries of the rights of Spillman Development Group under that agreement</u>. Enclosed herewith is a copy of the revised Spillman Ranch Cooperation Agreement marked to indicate changes to the draft we sent out yesterday. By copy hereof, we are sending a duplicate of the enclosure to all parties listed below for their simultaneous review." [Emphasis supplied.]

- Exhibit 41 – Letter from Armbrust and Brown over the signature of Sam D. Byars to John H. Norman dated September 17, 2002, re: Falconhead Golf Course – clubhouse land exchange, which states, "Enclosed herewith are the following documents which we have prepared in connection with the proposed clubhouse land exchange at the Falconhead Golf Course:

1. Special Warranty Exchange Deed

2. Loan Modification Agreement [Fire Eagle]

3. Loan Modification Agreement [American Bank]

4. Loan Modification Agreement [Spillman family]"

6

The letter is carbon copied with enclosures to both Mr. Walden and Mr. West.

- Exhibit 44 – Letter by Armbrust & Brown over the signature of Sam D. Byars to John Norman dated March 11, 2003 re: the $4,100,000.00 loan from Fire Eagle… which letter requests a subordination of Fire Eagle to ABT regarding a needed $900,000.00 "second loan" to have first priority by ABT and requesting that the Firemen Board allow the increase in principal of the senior debt. The letter further requests a resolution adopted by the Firemen's Board approving the subordination, and authorizing Mr. Hampton to execute on behalf of Fire Eagle any and all documents which may be required by American Bank of Texas in order to effectuate the subordination. The letter is copied to Bob West, and is forwarded to John H. Norman at 3100 Division Street, Metairie, LA 70002.

- Exhibits 5 & 6[1] – Letter from Jack Norman in Metairie, Louisiana to Richard Bischoff and Bob West in memorandum form dated August 31, 2001 enclosing a brief description of changes and clarifications of the loan agreement and note, which were discussed in a conference call.  Twenty-three changes were made, addressing senior indebtedness, defaults due on sale clauses, prepayment penalties, subordination, borrower's contribution, and other items, all of which are in the context of the combination of the necessity of both loans to be executed in order to complete the transaction.

- Exhibit 8 – Letter dated October 8, 2001 from Armbrust & Brown under signature of Sam D. Byars to Jack Norman at 3100 Division St., Metairie, LA 70001,

---

[1] These exhibits were inadvertently tabbed separately by the copy service and are discussed together.

enclosing revised drafts of the loan agreement, the Deed of Trust marked to indicate changes to the prior drafts, as well as rights of first refusal and the Intercreditor Agreement, with copies to Mr. Hampton of NOFF, Mr. West, Mr. Walden, and Mr. Bischoff.

- Exhibit 31 & 32, which should be read in conjunction –

Exhibit 31 – a letter from Bob West to Richard Bischoff regarding a change of the structure of the borrower SDG.

Exhibit 32 – a letter dated May 9, 2002 from Armbrust & Brown under signature of Sam D. Byars to Richard Bischoff referencing transfer of ownership interest in SDG Golf Management, LLC, and which includes the following requirement: "In addition, we will need consent of Fire Eagle, LLC with respect to the proposed transfers of limited partnership interest."

The requirement deals with a change to occur at ABT regarding the number of partners of SDG and suitable replacements for guarantors with ABT. Because the loans were viewed as one transaction, Fire Eagle, the junior lender, was required to approve the change within ABT – prior to Fire Eagle obtaining the ABT position.

**2.    The One Transaction Claim**

Factual disputes whether the group of loans for the purchase of the golf course constituted one transaction were not resolved in Plaintiff's favor. The court should have resolved this dispute in Fire Eagle's favor. In fact, a review of the loan documents and the exhibits to Plaintiff's Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction can only lead to the conclusion that the $7,200,000 loan originally made by

8

ABT (now owned by Fire Eagle), and the $4,100,000 loan made by Fire Eagle constitute one transaction and were made specifically for the purchase of the one golf course in Austin, Texas.

In the Order and Reasons the Court looks for "evidence that the parties intended the loans to be one transaction-such as negotiations between ABT and Fire Eagle, an executed partnership agreement, or indeed, any communication at all between ABT and Fire Eagle." However, the court overlooks the fact that loan documents show that each loan is dependent on the other and that each loan would not have been made without the other. The contracts are the law between/among the parties. It is also clear and undisputed that Bischoff, Gurasich, and West came to New Orleans, met with NOFF, and made a presentation to NOFF for the financing of the golf course.

The loans made by Fire Eagle and ABT are dependent upon each other for their own existence. In fact, ABT is a third party beneficiary of the loan between Fire Eagle and SDG. Similarly, Fire Eagle is a third party beneficiary of the loan between ABT and SDG. That is, without the Fire Eagle loan, the ABT loan would not have existed. Also, without the ABT loan, the Fire Eagle loan would not have existed. Neither loan would have been made without the other, and the court is in error by stating that no evidence exists "that the parties intended the loan to be one transaction" as the documents themselves required both loans in one transaction.

The evidence of one transaction sought by the court was clearly overlooked and not resolved in Fire Eagle's favor. Under the terms of the development loan agreements, the golf course was not constructed with money loaned by ABT only. Instead, the

development loan agreement required the ABT loan, as well as the Fire Eagle loan.  More importantly, the funds borrowed from Fire Eagle were to be fully used before ABT funded its loan.  The ABT Development Loan Agreement specifically states:

> Except in connection with the Initial Advance, Borrower shall have furnished evidence satisfactory to Lender that the Junior Loan, in the amount of $4,100,000.00, has been fully funded and that the proceeds thereof have been utilized in connection with the Mortgaged Property in accordance with the Budget.

(See section 3.2(w) on page 15 of Exhibit 27 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction (P. 53)).  In other words, $4,100,000.00 loaned by Fire Eagle from Louisiana was contractually required to be applied to the development project before any Texas money was loaned.  The requirement for the use of Fire Eagle's Louisiana money was clearly incorporated in the contract with ABT.  Simply stated, the golf course development would not have occurred without the Louisiana loan made by Fire Eagle.

There is no need for Fire Eagle to "bootstrap" the Fire Eagle loan onto the ABT loan, as this Court suggests.  The plain language of the contract between/among the parties including the Development Loan Agreement connects the two loans into one transaction.  That is, ABT requires the existence of and use of all Fire Eagle loan proceeds from Louisiana before any ABT funds are loaned.  Under <u>Sieferth</u>, this Court must resolve all doubts in Fire Eagle's favor.  The Order and Reasons clearly fails to resolve doubts regarding Fire Eagle's claim of one transaction in Fire Eagle's favor.

Fire Eagle has established that Personal Jurisdiction over the defendants exists in Louisiana by presenting *prima facie* evidence establishing that the ABT loan and the Fire

10

Eagle loan used to construct the golf course constitute one transaction. Therefore, this court has personal jurisdiction over each of the defendants. This court should reconsider the judgment of March 25, 2009, find that personal jurisdiction exists, and deny the motion to dismiss for lack of personal jurisdiction.

**3.     The Bischoff Presentation**

Factual disputes regarding the Bischoff presentation were not resolved in Plaintiff's favor. It is clear from the face of the Bischoff presentation, that Bischoff, acting as agent for each of the guarantors, made a presentation to Fire Eagle that sought a release of the very guaranties sued on herein. The Bischoff presentation specifically stated, in part:

> In exchange, the New Orleans Fire Fighters Pension and Relief Fund will assume Falconhead's $8,000,000 bank loan and $425,000 operating line of credit loan, releasing our guarantees, and assume all other equipment leases.

(See Exhibit 50 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction (P. 53)). The Bischoff presentation clearly solicits assistance from Fire Eagle on behalf of each of the defendants by stating:

> **we** now come to the Fund for assistance

(emphasis added) (Exhibit 50 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction (P. 53)). Additionally, the Bischoff Presentation sought Fire Eagle's assistance on behalf of all of the defendants stating in all caps and bold type:

> **BOTTOMLINE, WE NEED HELP** [underline provided]

11

(Exhibit 50 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction (P. 53)).  In the Order and Reasons, this Court notes that the Bischoff Presentation is signed by Richard Bischoff only.  However, the Bischoff Presentation clearly uses the word "we" repeatedly in seeking financial assistance from Fire Eagle relative to the loan that was originally made by ABT.  The "we" referred to in the Bischoff Presentation are the defendants in this case.  It is clear that the defendants in this matter came to Fire Eagle for assistance, through their agent Bischoff, and requested a release of the very guaranties made subject of this lawsuit.  The Bischoff Presentation alone should satisfy the requirements for establishing personal jurisdiction over the defendants.

On January 27, 2009[2], Fire Eagle secured the deposition of defendant, Robert West.  Mr. West was asked about the Bischoff Presentation and testified:

> Q.    (By MR. MARTINEZ)     Let me show you what's marked as Richard T. Exhibit 8, and it's titled "Proposal to NOFF Falconhead Golf Course, Austin, Texas, October 25, 2004."
> A.    All right.
> Q.    And it came with some handwriting on the top that's not mine, but – and ask you if you are familiar with that document.
> A.    Yes.
> Q.    Okay.  Did you – tell me to what extent you participated in the preparation of that document, please.
> A.    <u>Well, I participated in discussions between Steve Gurasich, Richard Bischoff, and myself as to what strategies</u>

---

[2] Fire Eagle secured Mr. West's testimony after filing the Memorandum in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.  Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (P. 47) was filed on July 11, 2008.  Fire Eagle's opposing memorandum (P.53) was filed on August 22, 2008.  Defendants filed a Reply (P.60) on September 23, 2008.  Fire Eagle filed its Further Reply (P. 62) on September 23, 2008.  This court issued the Order and Reasons (P.86) on March 25, 2009.  The deposition of Robert West was taken on January 27, 2009 at the time between Fire Eagle's Further Reply (P. 62), and the Order and Reasons (P. 86) issued by this Court.

<u>we might want to develop and offer to try to enhance the operation of the golf course.</u>  I don't recall participating in any way in actually drafting this letter, but I was certainly involved in – in discussions to try to develop these concepts. (underline added)

Q. Okay.  And you are on the page I wanted.  And we ought to note just to make sure on the record that – we've jumped about three years now in discussion just to stay on the same topic.  Did you participate in the – I believe there are three options laid out.

A. Let me read these.

Q. Sure.

A. Just give me a minute.

Q. Certainly.  Got it?

A. I'm ready.

Q. You've taken some time to take a look at that.  And do you remember what my question was?

A. No.

Q. Neither do I.  I believe it was:  Did you participate in preparing the terms of those three options?

A. Yes, I participated in helping develop the ideas contained in these options, yes.

Q. Okay.  And you were agreeable should the firemen accept any of those options to execute what would be required by you or the entities contained therein?

A. Yes.

Q. Okay.  So in Option 1, it simply provided for some cash it seems and an exchange for – I don't know – a certain amount of stock to be transferred to the firefighters that would be determined.  Is that pretty much it?

A. Uh-huh.

Q. So sort of an interim loan for some equity or a further equity input?

A. Yes.

Q. Okay.  And I'm just generally characterizing this so I can – okay.  No. 2 is labeled – well, No. 1 was labeled "Stock options."  No. 2 is labeled "Friendly Foreclosure," which generally includes 100 percent transfer of the golf course stock in Falconhead to the firemen and some other items that I'll ask about.  In – in exchange the firemen would assume Falconhead's $8 million bank loan and $425,000 operating line of credit loan releasing the collateral and guarantees.  And it says, <u>"Our collateral." I guess "our" means – that</u>

13

<u>would refer to Mr. Bischoff, Mr. West, Mr. Gurasich, Mr. Walden, and the Topfers?  See where it says "our"?</u> [underline added]
A.      <u>Yes.  Those would be the guarantees that would be referred to right there, yes.</u> [underline added]
Q.      And then, finally, it says that SD- -- and this is what I want to ask you about – SDG, if this option were taken, the "Friendly Foreclosure," "SDG will recommend to the SIG partners that they transfer up to half of the hotel real estate site at Falconhead, approximately nine acres, to the New Orleans' Firefighters Pension and Relief Fund."  Can you explain to me exactly what's meant by "SDG will recommend to the SIG partners"?
A.      Well, the SIG partners certainly wanted to have an operating first-class golf course continue.
Q.      Right.
A.      And as SDG partners, we felt like the SIG partners might be receptive to some concession if, in fact, New Orleans was going to pick up the golf course operation and keep it going in a first-class manner.
Q.      So it means more of the quality if that transfer occurred than the SIG members might hold out on that?
A.      Well, we assumed the SIG members might be amenable to doing that because they wanted to have a quality golf course operation continue on the site.
Q.      Okay.  And in large part the individuals who would make that decision would be the same individuals for both SDG and SIG; is that correct?
A.      Well, there's – there's a very big exception on the SDG side because of the unanimity that's required and Richard Bischoff being one of the three members of management on SDG side that would be required.
Q.      Okay.  Now I understand that a little –
A.      Okay.
Q.      -- better.
        And the third option, the "Official Foreclosure," I think is self-explanatory.
A.      I think it is, too.
Q.      Okay.  So those were the three options that were made at that time, right?
A.      Yes.  And they – I believe it was – it was Ritchie and I believe Bud and perhaps Terry again that came to Austin to meet with us about this –

14

> Q. Okay.
> A. -- proposal.
> Q. That has been a discussion among lawyers because we're trying to piece together facts. This occurred – this presentation occurred in Austin?
> A. Oh, absolutely. Yeah.
> Q. Well, remember they lost – my guys lost all their files.
> A. Okay.
> Q. And there was a question asked in the bankruptcy – just so you won't think we're trying to slip stuff in on you – that indicated that this meeting was in New Orleans. So –
> A. Well, I can make it easy.
> Q. You can make it clear for me now?
> A. I can make it very easy for you. I participated in this meeting and I never once went to New Orleans to meet with the New Orleans' Firefighters.
> Q. Great.
> Why don't you tell me quickly who was at that meeting. I know the three firemen. And then who else do we have?
> A. I believe we had Steve Gurasich, Bob West, Don Walden, and Richard Bischoff.
> Q. Okay. So it was six people?
> A. Well, I think that's seven. There's four of us and three firemen[3].

\*\*\*

The Bischoff Presentation alone should satisfy the requirements for establishing personal jurisdiction over the defendants. West states clearly, under oath, that he, Bischoff and Gurasich participated in discussions on strategy. West further admits that "we" refers to Bischoff, West, Gurasich, Walden and the Topfers when used in the Bischoff presentation and not a reference to Bischoff alone!

---

[3] See the Deposition of Robert H. West, January 27, 2009, p. 49, l. 16 through p. 54, l. 23 attached hereto as Fire Eagle Exhibit B.

In addition to the presentation, Gurasich corresponded with Fire Eagle, and copied that correspondence to Bischoff, Walden, and West (See Exhibits 53 and 54 to Plaintiff's Memorandum in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction (P. 53)). These additional correspondences were made as followup to the Bischoff presentation, and to inform the lender (Fire Eagle) of the status of the development project, which had already experienced economic difficulties.

As stated in Sieferth, and relied on by this Court, Fire Eagle only needs to make a *prima facie* showing of evidence to defeat the Motion to Dismiss for Lack of Personal Jurisdiction. This Court declined to consider the Gurasich correspondence as evidence sufficient to establish personal jurisdiction and states "characterizing the letter as a 'followup' to the proposal stretches matters considerably." Also, as to the Bischoff presentation, the Court stated "the Court is skeptical that a proposal to assume loans and wipe out guaranties, sent into Louisiana and rejected by the recipient, is sufficient." However, the Court does not properly apply the law of Sieferth. Fire Eagle made a *prima facie* showing sufficient to support Personal Jurisdiction. Again, all factual disputes, including those disputes subject to this court's "skepticism" should be resolved in Fire Eagle's favor. Therefore, this Court should reconsider the Order and Reasons issued on March 25, 2009, find that Fire Eagle made a showing sufficient to establish personal jurisdiction, and deny the Motion to Dismiss for Lack of Personal Jurisdiction.

## **CONCLUSION**

The Court failed to find minimum contacts with Louisiana under the second prong of the *Sieferth* test. That is, "whether the cause of action arises out of defendant's contacts with the forum state".

In analyzing this second prong, the Court is confronted with foreseeability. The Guarantors had two main events, which clearly showed that they were likely to be haled into Court in Louisiana. The first, was the request and ultimate funding by the New Orleans firemen from Louisiana to the project in Texas. The second was the request to the Bischoff presentation. In both instances, the defendants herein sought funding for their project from a statutorily created pension fund in Louisiana. These nonresident defendants voluntarily entered into contracts seeking funding from this forum. Therefore, the conclusion that, by splitting the loan into two transactions, the defendants didn't voluntarily enter into a contract that put them on notice that they would be haled into Court in Louisiana is factually incorrect and legally infirm. The Guarantors voluntarily executed initial contracts with two lenders. Both loans were necessary to complete their project. Each Defendant executed guaranties where the loans and the documents identified both lenders as third party beneficiaries of the Development Agreement and required the totality of borrowing to complete the project.

Thereafter, the Guarantors submitted another request for funding to the New Orleans Firemen in this forum. The Court found the contract to be executed by Bischoff only. However, testimony from Robert West (in the presence of Steve Gurasich) under oath, shows that the "we" refers to all the Guarantors. As such, the second attempt to

obtain funding from the same Louisiana pension fund constitutes a voluntary business activity in this forum by nonresidents who could clearly foresee they would be haled into a Louisiana Court, and as such, the action is sufficient minimum contact for a valid exercise of jurisdiction.

The Court relied on *Stuart,* 772 F.2d at 1193 (citing *Burger King,* 471 US at 479) for the factors the Court should consider in determining purposeful availment. Fire Eagle has shown in its summary of eight exhibits that purposeful availment through (1) prior negotiations, (2) contemplated future consequences, (3) terms of the contract, and (4) the parties' actual course of dealing, are all met. Essentially, the Intercreditor Agreement, the Development Loan Agreement, the correspondence, and the terms of the contracts show Louisiana was considered in negotiations, consequences, terms of the contract, and the course of dealing.

The Court concluded that plaintiff provided only documents that referred to the original Fire Eagle loan, and not the ABT loan, which Fire Eagle was forced to purchase after the development sought bankruptcy. In fact, many of the letters, waivers, and contracts required the execution of Fire Eagle for the ABT loan. (For example, see Exhibit 11, 41, 44, 5, and 6.) Through the course of conduct and the contracts, Fire Eagle waived many rights by subordination in favor of ABT, executed an Intercreditor Agreement, funded the second lien, which was required to be utilized first, and agreed to numerous loan modifications in order to facilitate the development.

These facts clearly show that Fire Eagle met the test that the communications and contracts were exactly what the Court was searching to find, despite the fact that titles on

documents and references on correspondence may have appeared to address only the original Fire Eagle loan.

Therefore, Fire Eagle asserts that minimum contacts have been appropriately met, both factually and under the requirements that any factual conflict be resolved in favor of the plaintiff.

Respectfully submitted,

*/S/Richard W. Martinez*

_____
**RICHARD W. MARTINEZ**
La. Bar Roll # 17040
Richard W. Martinez, APLC
228 St. Charles Ave., Suite 1310
New Orleans, LA 70130
Telephone: (504) 525-3343
Facsimile: (504) 525-6701
Email: richard@rwmaplc.com
Attorney for Fire Eagle, LLC

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing *Memorandum in Support of Motion to Reconsider Order Granting Defendants' Motion to Dismiss for Lack of Personal Jurisdiction* has been served upon counsel for all parties as listed on the attached service list by United States First Class Mail and/or electronic delivery this 8th day of April, 2009.

*/S/Richard W. Martinez*

_____
RICHARD W. MARTINEZ

## **SERVICE LIST**

George C. Freeman, III
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, LA  70112

Roy C. Cheatwood
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, LA  70170